**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ZUNI TRIBE;<br><br>UTE MOUNTAIN UTE TRIBE;<br><br>HOPI TRIBE,<br><br>*Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States;<br><br>DOUG BURGUM, in his official capacity as Secretary of the Interior;<br><br>STEVAN PEARCE, in his official capacity as Director of the Bureau of Land Management;<br><br>BROOKE ROLLINS, in her official capacity as Secretary of Agriculture;<br><br>TOM SCHULTZ in his official capacity as Chief of the U.S. Forest Service,<br><br>*Defendants*. | Case No. 26-cv-4092 |

## COMPLAINT
## INTRODUCTION

1. This case is about President Trump's latest attempt to revoke Bears Ears National Monument (the "Monument" or "BENM"). Falling within the homelands of the

Plaintiff Tribal Nations ("Plaintiff Nations" or "Plaintiffs"), the Bears Ears region is a living landscape. The iconic twin Bears Ears buttes—the namesake of the Monument—are just one sacred part of the Bears Ears region which the Hopi, Ute, and Zuni call home. Bears Ears' canyons and mesas hold the dwellings, granaries, ceremonial sites, rock writing, burial grounds, and gathering places of the ancestors of the Plaintiff Nations, who have lived on and cared for the Monuments' lands since time immemorial. It continues to facilitate many cultural and religious practices, subsistence gathering and hunting, and communion with ancestors. For the Plaintiff Nations and their members, Bears Ears is not a scenic backdrop or a reserve of minerals to be counted and extracted. It is a homeland, church, pharmacy, and library at once—an unbroken record of who they are and where they come from.

2. The Antiquities Act was enacted precisely to protect places like Bears Ears. Indeed, Bears Ears itself helped spur the passage of the Act over a century ago. The House Report accompanying the Act identified the "numerous ruins" of the Bluff District in San Juan County, Utah, and the "important relics of ancient 'basket makers'" along "Montezuma Creek, Recapture Creek, Cottonwood Creek, Butler Wash, Comb Wash, and Grand Gulch," that the President would be empowered to protect. Prehistoric Ruins on Public Lands, H.R. Rep. No. 3704, at 5 (1905).

3. Initially, Presidents failed to use their power under the Antiquities Act to confer on the Bears Ears region the Antiquities Act protection it required. Ten years ago, that changed. At the urging of Plaintiff Nations and two other tribal governments (collectively, the "Tribal Nations"), President Obama established the Bears Ears

National Monument, protecting approximately 1.35 million acres of the Bears Ears region, and sharing stewardship over the Monument with the Tribal Nations through a body called the Bears Ears Commission ("Commission" or "BEC"). The Commission, composed of elected officers from each of the Tribal Nations, gave the Tribal Nations active roles, alongside the U.S. Bureau of Land Management ("BLM") and the U.S. Forest Service ("Forest Service"), in the management of their ancestral homelands.

4. In 2017, President Trump issued a proclamation ("2017 Dismantling Proclamation") attempting to revoke Bears Ears National Monument. Plaintiff Nations, along with others, challenged that proclamation in suits still pending before this Court. But President Biden restored and strengthened the Monument's protections in 2021.

5. In the four years following President Biden's proclamation, the Tribal Nations, through the Commission, collaborated with the agencies to create a resource management plan ("RMP"), which developed rules for management of the Monument. The RMP repeatedly recognizes the critical role of the Commission in providing Tribal expertise and knowledge to ensure the protection of the many objects of cultural and scientific importance within the Monument. The RMP emphasizes the ongoing importance of the Tribal Nations to implementing the RMP and managing the Monument.

6. Now, however, President Trump has tried again to revoke Bears Ears National Monument and undermine the Tribal Nations' unique role in the Monument's management. On July 13, 2026, the President issued a new proclamation ("2026

Dismantling Proclamation") purporting to revoke Bears Ears. This time, President Trump claimed to revoke protections for roughly 91% of the Monument, purportedly shrinking it from approximately 1.36 million acres down to two units comprising just 121,100 acres. As for the Commission, President Trump went further than his previous proclamation by purporting to abolish the Commission and eliminate the obligation to consult with the Tribal Nations, undoing the government-to-government relationships that the Tribal Nations and federal agencies had spent years cultivating.

7. President Trump's first proclamation was unlawful, because President Trump had no power to issue it. The Antiquities Act grants the President a single, carefully bounded authority: to protect areas like Bears Ears by *declaring* national monuments. It says nothing—not one word—about *revoking* such protections. The power to shrink or dissolve a national monument, like the power to dispose of federal land itself, belongs to Congress alone—a limit the Executive Branch's own lawyers recognized for nearly ninety years, and one Congress reaffirmed when it reserved that authority to itself in the Federal Land Policy and Management Act of 1976.

8. The 2026 Dismantling Proclamation is unlawful in the same ways as the 2017 Dismantling Proclamation, but on a larger scale. And the federal agencies' actions vis-à-vis the Commission in response to the 2026 Dismantling Proclamation give rise to additional claims for failing to follow the established RMP—including, importantly, rules requiring the Commission's involvement in implementing those plans.

9. Plaintiffs thus bring this challenge against the 2026 Dismantling Proclamation and against the agency actions purporting to implement it. Plaintiffs respectfully ask the

Court to declare Defendants' actions unlawful and to enjoin the federal agencies from implementing the 2026 Dismantling Proclamation.

**JURISDICTION AND VENUE**

10. This action arises under the Antiquities Act and Articles I, II, and IV of the United States Constitution. This action also arises under sections 701 through 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

11. This Court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

12. Defendants lack sovereign immunity because their actions giving rise to this suit were *ultra vires*. The APA also waives sovereign immunity for this action. 5 U.S.C. § 702.

13. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority to issue equitable relief. Injunctive relief is also authorized for claims under sections 705 through 706 of the APA.

14. Venue is proper pursuant to 28 U.S.C. § 1391 because the Defendants reside in this judicial district and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**PLAINTIFFS**

15. Plaintiff ZUNI TRIBE is a sovereign Tribal Nation, recognized by the United States,

with lands located in Arizona and New Mexico. 91 Fed. Reg. 4102, 4105 (Jan. 30, 2026). The Zuni Tribe maintains a government-to-government relationship with the United States. The Zuni signed treaties with the United States in 1850 and 1851. The Zuni reservation was established by executive order in 1877.

16. Plaintiff UTE MOUNTAIN UTE TRIBE is a sovereign Tribal Nation, recognized by the United States, with lands located in Utah, Colorado, and New Mexico. 91 Fed. Reg. at 4105. The Ute Mountain Ute Tribe maintains a government-to-government relationship with the United States. The Ute Tribes signed treaties with the United States in 1849, 1863, and 1868, and the Ute Mountain Ute signed another treaty establishing its reservation in 1878.

17. Plaintiff HOPI TRIBE is a sovereign Tribal Nation, recognized by the United States, with lands located in Arizona. 91 Fed. Reg. at 4104. The Hopi Tribe maintains a government-to-government relationship with the United States. The Hopi reservation was created by executive order in 1882.

## DEFENDANTS

18. Defendant DONALD J. TRUMP is sued in his official capacity as President of the United States. He currently resides and performs his duties in Washington, D.C.

19. Defendant DOUG BURGUM is sued in his official capacity as the Secretary of the Interior of the United States. In that capacity, he is responsible for ensuring that the Department of the Interior and its constituent agencies, including BLM, comply with the 2026 Dismantling Proclamation's direction and requirements regarding the

management of Bears Ears. Secretary Burgum performs his duties in Washington, D.C.

20. Defendant STEVAN PEARCE is sued in his official capacity as the Director of the Bureau of Land Management within the Department of the Interior. In that capacity, he is responsible for ensuring that BLM complies with the 2026 Dismantling Proclamation's direction and requirements regarding the management of Bears Ears. Director Pearce performs his duties in Washington, D.C.

21. Defendant BROOKE ROLLINS is sued in her official capacity as the Secretary of Agriculture. In that capacity, she is responsible for ensuring that the Department of Agriculture and its constituent agencies, including the Forest Service, comply with the 2026 Dismantling Proclamation's direction and requirements regarding the management of Bears Ears. Secretary Rollins performs her duties in Washington, D.C.

22. Defendant TOM SCHULTZ is sued in his official capacity as Chief of the Forest Service within the Department of Agriculture. In that capacity, he is responsible for ensuring that the Forest Service complies with the 2026 Dismantling Proclamation's direction and requirements regarding the management of Bears Ears. The Chief of the Forest Service performs his duties in Washington, D.C.

23. Collectively, Donald J. Trump, Doug Burgum, Stevan Pearce, Brooke Rollins, and Tom Schultz are "Defendants"; Doug Burgum, Stevan Pearce, Brooke Rollins, and Tom Schultz are "Agency Defendants"; and Brooke Rollins and Tom Schultz are "Forest Service Defendants."

24. Defendants have the authority, ability, and obligation to remedy the harms to Plaintiff

Nations.

## BACKGROUND

### I. Overview of Native American Connections to Bears Ears

25. "Rising from the center of the southeastern Utah landscape and visible from every direction are twin buttes so distinctive that in each of the native languages of the region their name is the same: Hoon'Naqvut, Shash Jáa, Kwiyagatu Nukavachi, Ansh An Lashokdiwe, or 'Bears Ears.'" Proclamation No. 9558, 82 Fed. Reg. 1139, 1139 (Dec. 28, 2016) ("2016 Designating Proclamation"); *see generally* Proclamation No. 10285, 86 Fed. Reg. 57321 (Oct. 15, 2021) ("2021 Restoration Proclamation"). Below is a picture of the Bears Ears buttes formation.



26. The buttes are emblematic of the larger Bears Ears region. Many Native Americans and tribal nations, including Plaintiffs and their members, have profound historic,

cultural, and spiritual ties to Bears Ears and the more than 100,000 historic landmarks, structures, and historic and scientific objects located within Bears Ears. BLM, Bears Ears National Monument Proposed RMP and Final Env't Impact Statement, vol. 1 at 3.3.3 at 3-4 (2024) ("FEIS");[1] *see also* Robert S. McPherson, *A History of San Juan County: In the Palm of Time* (1995).

27. Plaintiffs and their members trace their ancestry back millennia to the ancient peoples who have populated the region since time immemorial. Their presence is manifested in the migration routes, ancient roads, great houses, villages, granaries, hogans, wikiups, sweat lodges, corrals, tipi rings, shade houses, pueblos, kivas, rock paintings, petroglyphs, pictographs, and cliff dwellings that continue to dominate the Bears Ears landscape today.

28. The Zuni, for instance, are tied to the Bears Ears region because it "holds immense importance for all the Pueblo people'[s] identity and history." Zuni Tribal Council, Permanent Protection of Bears Ears Region through National Monument Designation, Res. No. M70-2016-P014, at 1 (Mar. 7, 2016) ("2016 Zuni Resolution"), https://www.bearsearscoalition.org/wp-content/uploads/2016/03/M70-2016-P014-Bears-Ears-Designation-7MAR2016.pdf. The Bears Ears physical landscape (*Ansh An Lashokdiwe*) is part of the traditional Zuni cultural landscape, which covers all of the territory crossed by their ancestors during migrations to the Middle Place

[1] The BLM and Forest Service document repository, including this FEIS and the Resource Management Plan ("RMP") associated with Bears Ears National Monument, are *available at* https://eplanning.blm.gov/documents/?id=96d264cd-a7f2-f011-8406-001dd80ef717&spid=2be9277f-a8f2-f011-8407-001dd80db62a.

(*Halona I'tawana*)—the fixed point around which the entire world is organized. Tony Hillerman et al., *Middle Place*, UNM University Libraries, https://ehillerman.unm.edu/1968#sthash.n6PtaIom.dpbs (last visited Nov. 10, 2026). Zuni origin history reflects the depth of the connection the Zuni people have to Bears Ears and is physically reflected in areas like ancestral rock marking locations. The historical and cultural topics expressed in rock markings include clan identification, boundary negotiations, year counts, political positions and statuses, personal signatures and insights, deities, animal tracking, and communications intended for descendants. These and other natural resources located within Bears Ears are still "necessary for traditional and spiritual practice." 2016 Zuni Resolution, at 1.

29. Similarly, the continued collection and use of resources from ancestral areas enables Hopi people to remain connected to the traditions and lands used by their ancestors. Petroglyphs, artifacts, landmarks, and landforms in Bears Ears help Hopi people verify their clan histories, so visitation to Bears Ears is essential for Hopi people and members to preserve their ties to this area. Although many clans have specific ties to the Bears Ears area because of their migration histories, this landscape is significant to all Hopi people.

30. The well-maintained kivas from the *Hisatsinom*—the People of Long Ago—exemplify the important cultural and spiritual connection that specific objects within Bears Ears provide to the Hopi and Zuni. Ancestral kivas, like those of today, were entered by a ladder stretching from the roof down to the center of the floor. *See Ancestral Sites Tour-Pueblo Ceremonial Room*, National Park Service,

https://www.nps.gov/places/ancestral-sites-tour-pueblo-ceremonial-room.htm (last visited Nov. 10, 2026). Below is a picture of a kiva in the Cedar Mesa region of Bears Ears. *Bears Ears Monument Timeline*, Durango Herald (Dec. 28, 2016), https://www.durangoherald.com/articles/news/bears-ears-monument-timeline/.



31. Kivas are still used in Pueblo ceremonies today. *See Ancestral Sites Tour-Pueblo Ceremonial Room*, *supra*. Many kivas are designed with specific elements, including a small hole in the floor (*sipapu*). This element symbolizes "the Pueblo people's emergence from the underworld." *Id.* As one court noted, the "kivas are the focal point of all religious activity in the Hopi Villages." *Navajo Nation v. U.S. Forest Serv.*, 408 F. Supp. 2d 866, 894 (D. Ariz. 2006), *aff'd in part, rev'd in part and remanded*, 479 F.3d 1024 (9th Cir. 2007), *and aff'd on reh'g en banc*, 535 F.3d 1058 (9th Cir. 2008). Thus, maintaining and preserving the ancestral kivas in Bears Ears is of utmost importance

to the Hopi and Zuni, as well as other descendants of the Ancestral Puebloans.

32. Ancient roads within Bears Ears are likewise tied to the Hopi and Zuni, who are well known for their migration throughout the region. *Nat. Arch and Bridge Soc'y v. Alston*, 209 F. Supp. 2d 1207, 1211 (D. Utah 2002) (discussing Hopi migration through San Juan County); *see Navajo Nation*, 479 F.3d at 1041 (discussing the migrations). The Hopi and Zuni maintain traditional and historic stories, passed down from clan to clan, about their migration that are integral to their culture and religion. *Zuni Tribe of New Mexico v. United States*, 12 Cl. Ct. 607, 616 (Cl. Ct. 1987) ("The ancient ties of Zuni people to their land is presently manifest in the tribal oral tradition about Zuni origin and migration and in the physical artifacts representing the archaeological history of Zuni culture."); Canyon Farmers, National Parks Service History eLibrary, http://npshistory.com/publications/nava/index.htm (describing the sacred migration paths of Hopi clans).

33. The Ute Mountain Ute Tribe also has deep ties to Bears Ears. The aboriginal territory of the Ute covered an extensive area of land in what are now the states of Colorado, Utah, New Mexico, and Arizona. FEIS, vol. 1 at 3-5. This included much of Bears Ears.

34. The Bears Ears region—*Kwiyagatu Nukavachi*—is known as the place where bears first come out of their winter hibernation. This event is significant to the traditional Bear Dance, during which various Ute bands would gather to camp in the spring and share songs created or practiced over the winter to show respect for the spirit of the bear. Historically and to this day, the Ute Bear Dance, which is a spring ceremony symbolic

of nature's awakening, is performed in areas in and around Bears Ears.

35. Utes derive traditional knowledge from certain petroglyph panels within Bears Ears for their Bear Dances, thus necessitating the protection of those petroglyphs.

36. Over millennia, the Ute people also developed traditions and histories that recorded sources of water and food and the proper ways to treat and process these resources. FEIS, vol. 1 at 3-5. The Ute still use the Bears Ears area for hunting, foraging, and fishing, and to gather materials for medicinal, spiritual, and other uses.

37. In addition to their traditional ties to the Monument, the Utes have property interests tied to the Monument. The Ute Mountain Ute and many of its members hold public lands grazing permits and allotment lands there. *Id.* And the Ute Mountain Ute has reservation land in Utah near Bears Ears. It thus benefits from the economic development that preservation of Bears Ears provides. Tri-Ute Council, Support for Presidential Designation of the Bears Ears National Monument to Protect Cultural, Historical, and Natural Resources on Federal Lands in San Juan County, UT, Joint Inter-Tribal Res. No. 16-001, at 1 (June 14, 2016), https://www.bearsearscoalition.org/wp-content/uploads/2016/06/TriUteReso6132016-1.pdf.

## II. The Designation of Bears Ears National Monument

38. Because of their deep and continuing ties to Bears Ears and their obligation to serve as its stewards, Plaintiff Nations endeavored to secure protections for the Bears Ears region for many decades. That effort accelerated in the 2010s, when Plaintiff Nations began proposing and advocating for monument status for Bears Ears.

39. Their effort bore fruit. On December 28, 2016, President Obama proclaimed Bears Ears a national monument pursuant to the Antiquities Act. President Obama made this decision because of the historic and scientific objects the Monument contains, their importance to Plaintiff Nations, and the near-constant threats of exploitation and damage to those objects. *See generally* 2016 Designating Proclamation.

40. The 2016 Designating Proclamation described in detail the geological, paleontological, archaeological, historical, cultural, and ecological significance of Bears Ears and the landmarks and objects to be protected therein. *Id.* at 1139-43. The 2016 Designating Proclamation reserved 1.35 million acres of land that the President determined was necessary for the proper care and management of the objects of historic and scientific interest to be protected. *Id.* at 1143.

41. While the area is important to all Americans, the 2016 Designating Proclamation specifically recognized that "the land is profoundly sacred to many Native American tribes, including" the Ute Mountain Ute Tribe, Hopi Tribe, and Zuni Tribe. *Id.* at 1139.

42. The 2016 Designating Proclamation included specific provisions that are essential to the protection of Bears Ears and Plaintiffs' cultural and spiritual connection to the many historic and scientific objects within Bears Ears. *Id.* at 1143-44.

43. The 2016 Designating Proclamation also protected against looting, giving warning "to all unauthorized persons not to appropriate, injure, destroy, or remove any feature of the monument and not to locate or settle upon any of the lands thereof." *Id.* at 1145.

44. Critically, in recognition "of the importance of tribal participation to the care and management of the objects [in Bears Ears], and to ensure that management decisions

affecting the monument reflect tribal expertise and traditional and historical knowledge," the 2016 Designation Proclamation established the "Bears Ears Commission" to "provide guidance and recommendations on the development and implementation of management plans and on management of the monument." *Id.* at 1144. The Commission consists of "one elected officer each from the Hopi Nation, Navajo Nation, Ute Mountain Ute Tribe, Ute Indian Tribe of the Uintah Ouray, and Zuni Tribe." *Id.*

45. The Commission gives the Tribal Nations a government-to-government seat at the table to provide substantial, meaningful, and continuous input on management of the Monument and how to more effectively protect the immensely important historic, scientific, and cultural objects within Bears Ears. Overall, the 2016 Designating Proclamation directed the Secretaries to work with the Commission or a comparable tribal entity, on a government-to-government basis, "to ensure that management decisions affecting the monument reflect tribal expertise and traditional and historical knowledge." *Id.* at 1144.

46. The 2016 Designating Proclamation directed the Secretaries to "meaningfully engage" the Commission in the development of a management plan and subsequent management of the monument, and to "carefully and fully consider integrating the traditional and historical knowledge and special expertise of the Commission." *Id.* If the Secretaries "decide not to incorporate specific recommendations" of the Commission, they must "provide the Commission . . . with a written explanation of their reasoning." *Id.*

### III. President Trump's First Attempt to Revoke Bears Ears as a National Monument and Replace it with Monument "Units"

47. On December 4, 2017, President Trump purported to revoke Bears Ears National Monument and replace it with two much smaller "units," Indian Creek and Shash Jáa, removing protection from tens of thousands of cultural and archaeological sites within some 1.1 million contiguous acres. 82 Fed. Reg. 58085, 58085 (Dec. 8, 2017).

48. Plaintiff Nations and others sued President Trump over the 2017 Dismantling Proclamation in December 2017. That action, *Hopi Tribe v. Trump*, No. 1:17-cv-02590-TSC (D.D.C.), remains pending before this Court.

### IV. President Biden's Restoration of Bears Ears

49. In October of 2021, President Biden issued a proclamation restoring Bears Ears National Monument. 2021 Restoration Proclamation, 86 Fed. Reg. at 57321.

50. President Biden's Proclamation declared monument protections for lands and objects spanning approximately 1.36 million acres. The Proclamation restored protections to all lands covered by the 2016 Designating Proclamation.

51. The 2021 Restoration Proclamation built on the 2016 Designating Proclamation, describing Bears Ears as holding a "unique density of significant cultural, historical, and archaeological artifacts spanning thousands of years," including ancient cliff dwellings, large villages, granaries, kivas, towers, ceremonial sites, prehistoric steps cut into cliff faces, and a prehistoric road system connecting the people of Bears Ears to each other and beyond. 2021 Restoration Proclamation at 57321, 57327. It identified objects of great historic, cultural, and scientific significance to the Tribal Nations

throughout the Monument's subregions—among them the Bears Ears Buttes, Indian Creek, Beef Basin, the Blue Mountains, Cottonwood Canyon, Elk Ridge, Cedar Mesa, and Grand Gulch, which likely holds the highest concentration of Ancestral Pueblo sites on the Colorado Plateau. *Id.* at 57323-30. These places "facilitate the practice of traditions and serve as a mnemonic device that elders use to teach younger generations where they came from, who they are, and how to live." *Id.* at 57323.

52. Acknowledging the "importance of knowledge of Tribal Nations about these lands and objects and participation in the care and management of the objects identified," President Biden also "reestablished" the Bears Ears Commission "in accordance with the terms, conditions, and obligations set forth" in the 2016 Designating Proclamation, including the federal obligations to consult with it or a comparable tribal entity. *Id.* at 57332.

**V. Implementation of the 2021 Restoration Proclamation**

53. Following the 2021 Restoration Proclamation, the Commission and the agencies jointly prepared an RMP for the Monument. *See generally* BLM, Bears Ears National Monument Record of Decision and Approved RMP (Jan. 2025) ("BLM ROD"), *available at* https://eplanning.blm.gov/documents/?id=96d264cd-a7f2-f011-8406-001dd80ef717&spid=2be9277f-a8f2-f011-8407-001dd80db62a; Forest Service, Bears Ears National Monument Record of Decision, § 3 at 2, and Attachment 3 (Jan. 2025) ("Forest Service ROD"), *available at* https://eplanning.blm.gov/documents/?id=96d264cd-a7f2-f011-8406-001dd80ef717&spid=2be9277f-a8f2-f011-8407-001dd80db62a. There are minor

formatting differences in how the RMP appears in the BLM and Forest Service RODs, but they are substantively the same.

54. The RMP requires the agencies to collaborate with the Commission, or a comparable tribal entity, on the site-specific, implementation-level management that follows the plan and on any future maintenance or amendment of the plan, and state that this ongoing collaboration "is necessary for the agencies to manage BENM consistent with Proclamation 10285 and the protection of BENM objects." Bears Ears ROD, § 2.3.1.1 at 27. Moreover, the RMP commits the agencies to meet with the Commission annually to develop a joint annual work plan, to annually review the plan and the status of its implementation, and to quarterly collaborate and consult on land management priorities, implementation-level decision-making, and upcoming federal actions and authorizations. *Id.*, § 2.3.1.2 at 28-29. They further require the agencies to notify the Commission at least fifteen business days before initiating an implementation-level project and to provide a written explanation at least thirty days in advance if they decline to incorporate the Commission's recommendations. *Id.*, § 2.3.1.2 at 28.

55. The RMP emphasizes resource protection and the use of Traditional Indigenous Knowledge and perspectives in the stewardship of the Bears Ears landscape. *See generally* Bears Ears ROD and Forest Service ROD.

56. Following issuance of the RMP, Plaintiff Nations continued to invest resources into the Commission to implement the RMP. Plaintiff Nations helped identify culturally sensitive areas to protect and restore, reviewed proposed activities to ensure their compatibility with protection of the Monument, and provided education for

Monument visitors. These efforts required Plaintiff Nations to invest significant financial and personnel resources.

**VI. Plaintiff Nations' Request for Consultation Before Executive Action**

57. Amid implementation of the RMP, word spread that the new Trump Administration had plans to take executive action to reduce the Monument yet again.

58. Consistent with the RMP, on March 25, 2025, the Commission sent a letter to Secretary Burgum requesting a meeting before any executive action was taken regarding the Monument.

59. On June 23, 2025, Bill Groffy, then the BLM Acting Director, responded to the Commission's March 25 letter. He promised to contact the Commission and Tribal leaders for a meeting should the United States consider changes to the boundaries, management, or designation of the Monument. No such consultation ever occurred. However, the Commission and the agencies continued to collaborate to implement the RMP until July 13, 2026.

**VII. President Trump's Second Attempt to Revoke Bears Ears**

60. On July 13, 2026, President Trump issued Proclamation No. 11043, purporting to again revoke Bears Ears National Monument. Proclamation No. 11043, 91 Fed. Reg. 45169 (July 13, 2026).

61. The 2026 Dismantling Proclamation's purported reasoning was tied to examining several non-statutory "factors." These included "uniqueness," "resources available," "nature of protection needed," "protection provided by . . . other laws," and whether the lands are "better suited for other non-monument uses." *Id.* at 45169.

62. In purporting to shrink the monument boundaries, the 2026 Dismantling Proclamation excludes roughly 91% of the lands protected by the 2021 Restoration Proclamation, diminishing even the monument boundaries purportedly established by the 2017 Dismantling Proclamation.

63. As with the 2017 Dismantling Proclamation, the 2026 Dismantling Proclamation purports to create two units with monument protections, this time consisting of just 121,096 acres of land, about 80,000 acres less than under the 2017 Dismantling Proclamation.

64. In its drastic reduction of the Monument, the 2026 Dismantling Proclamation contradicts its own reasoning. In one breath, it claims that lithic scatters, petroglyphs, and pictographs are not worthy of Monument protections, as they are found across the American West and are not unique to the Bears Ears region. 91 Fed. Reg. 45171. Just a page later, though, it claims the new units must be protected because they contain an abundance of cultural and archeological objects spanning thousands of years of human history, *including lithic scatters, petroglyphs, and pictographs*. *Id.* at 45171.

65. The 2026 Dismantling Proclamation provided that sixty (60) days from the date of the Proclamation's issuance, the unreserved lands would be opened to, *inter alia*, entry, location, sale, and other disposition for mining and mineral and geothermal leasing.

66. The Proclamation goes even further to encourage maximal vehicle use, for any purpose, in the Monument. Namely, it directs the agencies to "prepare a new transportation plan that endeavors to maximize public access to the Monument"; invites the agencies to allow "motorized and non-motorized vehicle use on roads and

trails designated for such use immediately before the [2016 Designating Proclamation]"; and allows the agencies to "designate for motorized vehicle use roads and trails that were not designated for such use prior to the [2016 Designating Proclamation], regardless of the purpose of that use." *Id.* at 45174.

67. Finally, the 2026 Dismantling Proclamation claims the Commission is immediately "disbanded and terminated" and that the Secretaries have no obligation to engage, consult, or coordinate with the Commission or a comparable tribal entity. It purports to replace the Commission with a new federal advisory committee, a non-tribal body that does not engage in government-to-government relations with the United States and has none of the procedural and substantive rights of the Commission.

**VIII. The Agencies' Decision to End Consultation with the Bears Ears Commission**

68. On July 15, 2026, just two days after the 2026 Dismantling Proclamation, the agency personnel with whom the Commission had been collaborating on Monument management told the Tribal Nations' Commissioners that the agencies would no longer recognize the Commission or engage with the Commission in implementation of the RMP or management of the Monument. Instead, the agency personnel said they would only work with individuals representing their respective Tribal Nations, and only as part of the federal advisory committee established by the 2026 Dismantling Proclamation or for Tribal consultation on historic properties pursuant to section 106 of the National Historic Preservation Act ("NHPA"). The agency personnel stated that any portions of the RMP implicating involvement of the Commission were

"overridden" by the 2026 Dismantling Proclamation.

69. On July 16, 2026, the same agency personnel further demonstrated they would no longer recognize or work with the Commission. The Commission and the agencies had planned a meeting for July 16 to engage in Monument management activities, including convening at an incident command center to monitor ongoing wildfires in the Monument and riding a proposed off-highway vehicle ("OHV") route for a special recreation permit ("SRP") for an all-terrain vehicle ("ATV") rally the Commission had been reviewing. Although the agency personnel and Tribal Nation representatives who served on the Commission appeared for the meeting, the agency personnel refused to work with the Tribal Nation representatives as the Commission.

70. On August 4, 2026, the Tribal Nations sent a letter to Agency Defendants requesting the agencies fulfill their obligations to consult with the Commission. The letter asked for Agency Defendants' response prior to August 12, 2026, so that the matter could be resolved prior to the next monthly meeting scheduled for August 20, 2026.

71. Agency Defendants did not respond to the letter. Instead, on August 7, 2026, Jared Lundell, BLM Archeologist for the Monticello Field Office, emailed a cancellation of the standing Microsoft Teams invite that had been used to fulfill the RMP requirement for regular meetings with the Commission. Mr. Lundell's cancellation included a message explaining the cancellation was "due to the changes in the proclamation."

72. Agency Defendants have thus decided that they will not fulfill the obligations in the RMP to consult with the Commission and work with it on Monument management activities. This includes a mandatory quarterly meeting that was scheduled to occur

by the end of October 2026 but never took place. *See, e.g.*, BLM ROD § 2.3.1.2 at 29 (requiring quarterly meetings "to collaborate and consult on Tribal Nations' land management priorities, public land resource issues, opportunities for joint Tribal-federal program development, BEC participation in implementation-level decision-making processes, and landscape-level management issues and to provide awareness of upcoming federal actions and authorizations"). It also includes Agency Defendants' obligations to convene the annual review of the RMP and develop a joint annual work plan. *See id.*

## IX. The Forest Service's Work on a 95,000-Acre Post-Fire Project in the Monument Without Notice to and Collaboration with the Commission

73. On June 26, 2026, lightning ignited the Babylon Fire in the Abajo Mountains southwest of Monticello, Utah. Before it was contained, the fire burned approximately 107,189 acres, including portions of Elk Ridge, the Dark Canyon Wilderness, and Forest Service lands within the Monument.

74. The Commission had been engaged in the agencies' response to the fire. As alleged above, the Commission and the agencies had planned to convene for fire-monitoring activities at an incident command center on July 16, 2026, and agency personnel refused that day to work with the Tribal Nations' representatives as the Commission.

75. Four days later, on July 20, 2026, a Forest Service Burned Area Emergency Response ("BAER") team began assessing the burned area to identify post-fire threats to "critical natural or cultural resources," and to recommend emergency measures in response. U.S. Forest Serv., U.S. Dep't of Agric., *Babylon Fire Area Summary Burned Area Report* at

1 (2026) https://bearsearspartnership.org/images/pdfs-doc/BabylonBAER_PublicReport.pdf. The team completed its field assessment on July 28, 2026. *Id.* It evaluated cultural resources in the burned area; identified threats to cultural sites from erosion, falling trees, looting, and vandalism; and proposed treatments for those sites along with closures of areas and trails. *Id.* at 5-6. The Forest Service reports that the team "worked closely with San Juan County, the city of Monticello, the State of Utah, the National Weather Service, and other partners." *Id.* at 1. Yet the Forest Service did not notify the Commission of the assessment or the treatments it proposed, and did not offer the Commission an opportunity to collaborate on them.

76. The Forest Service continued its response to the fire by initiating the Babylon Post-Fire Recovery Project, Project No. 438123 ("Babylon Project"), covering approximately 95,160 acres of the burned area. The Babylon Project prescribes recovery activities, including salvage and harvesting of dead and damaged trees and of trees judged likely to die within five years; non-mechanical and mechanical fuels reduction; grading, draining, and reconstruction of roads; construction of temporary roads; repair, reconstruction, and relocation of trails; and reforestation. *See generally* Forest Serv., U.S. Dep't of Agric., *Babylon Post-Fire Recovery Project: Draft Finding of No Significant Impact* (ELMS No. 438123, Oct. 20, 2026) ("FONSI"), https://www.fs.usda.gov/r04/manti-lasal/projects/438123.

77. The Babylon Project area lies within the boundaries of the Monument per the 2021 Proclamation but outside of the boundaries as declared by the 2026 Dismantling Proclamation.

78. The RMP requires that "[a]t least 15 business days prior to initiating an implementation-level project in BENM, the agencies will provide initial notification to the BEC and provide an opportunity to collaborate via email." BLM ROD, § 2.3.1.2 at 29; Forest Service ROD Attachment 3 at 3.

79. If the Commission elects to participate, the agencies "will provide a schedule that includes the time frames for the BEC to provide input" as part of each internal review stage and before the final decision is issued, and "will provide notice to the BEC at least 15 business days before each internal review stage and before the final decision is issued." *Id.*

80. If the decisionmaker declines to adopt the Commission's written recommendations, the agencies "will provide the BEC written explanation at least 30 days prior to issuing the document" on which the recommendations were made, and the Commission may, within 15 days, request a meeting with the Forest Service regional forester or BLM state director to discuss any disagreement. *Id.*

81. The RMP further provides that the agencies "will collaborate with the BEC, or a comparable Tribal representative body, on the site-specific implementation-level management that follows" the RMP. BLM ROD § 2.3.1.1. at 27; Forest Service ROD Attachment 3 at 3.

82. On October 20, 2026, the Forest Service released a draft decision and draft finding of no significant impact for the Babylon Project, with comments due November 3, 2026. U.S. *See generally* FONSI. The draft decision provided that implementation would begin no sooner than November 6, 2026. *Id.* at 4.

83. At no time—not fifteen business days before initiating the Babylon Project, not before any internal review stage—did the Forest Service notify the Commission of the Babylon Project or offer it an opportunity to collaborate, as the RMP required.

84. The Forest Service did not collaborate with the Commission in developing the stipulations, design criteria, or contract terms governing the Babylon Project's discretionary activities, or in planning the Babylon Project's road, temporary-road, and trail work.

85. Had the Forest Service provided the notice and opportunity to collaborate the RMP requires, the Commission would have brought the Tribal Nations' Traditional Indigenous Knowledge to bear on the design of the Babylon Project, including for protection and preservation of immensely important cultural and natural resources in the burn area.

86. For example, the Babylon Project's promotion of using salvaged wood for commercial timber production, rather than making wood available to Tribal members for ceremonial practices and subsistence uses. FONSI, at 6. This is inconsistent with the RMP, which requires trees be handled to help meet the needs of Tribal Nations and their communities, including providing them with fuelwood and wood products, and

requires these purposes take priority over timber production for commercial sale. Forest Service ROD Attachment 3 at 17.

### X. Plaintiff Nations' Injuries

87. In issuing and implementing the 2026 Dismantling Proclamation, Defendants have caused, are causing, and threaten to cause further harm to Plaintiff Nations and their members. None of these injuries can be remedied with money damages, and Plaintiff Nations therefore have no adequate remedy at law.

#### A. The Proclamation Has Removed the Monument's Protections and Set Harmful Activity in Motion

88. The 2021 Restoration Proclamation and the RMP, informed by the Commission's knowledge and expertise, protected the Monument against oil and gas exploration and development, hard-rock mineral location, underregulated OHV use, vandalism and looting, and reckless recreation. *See generally* 2021 Restoration Proclamation. The 2026 Dismantling Proclamation attempts to sweep those protections away from roughly 91% of the Monument.

89. The 2026 Dismantling Proclamation most immediately does that with respect to the mining protections, which the Proclamation purports to already have stripped away. The excised lands hold potential uranium, oil and gas, and potash reserves that extractive companies have targeted for development.

90. Since September 11, 2026, according to the terms of the 2026 Dismantling Proclamation, the excised lands have been open to location, entry, and patent under mining laws without the protections of the 2016 Designating Proclamation and 2021

Restoration Proclamation. As a result, nothing now stands between a claimant and the ground. Under the General Mining Act of 1872, a prospector needs no permit or other prior authorization from BLM or any other agency to locate a claim and enter the land. A claimant may engage in "casual use" activities without any prior approval. 43 C.F.R. § 3809.10(a). And a claimant may undertake "notice-level" activities—defined as "causing surface disturbance" on up to five acres—after sending BLM notice of its plans. 43 C.F.R. §§ 3809.10(b), 3809.21(a), 3809.312(a), 3809.605(b). The resumption of even these activities disturbs surface soils and can destroy objects that are hundreds or thousands of years old and in fragile condition.

91. Mining on the excised lands is not hypothetical. Industry actors began attempting to stake claims even before September 11, 2026—among them Kyle Kimmerle, a miner who challenged the 2021 Restoration Proclamation. Hannah Northey & Ian M. Stevenson, *Miners Stake Claims After Trump Shrinks Utah Monuments*, E&E News (Aug. 18, 2026), https://www.eenews.net/articles/miners-stake-claims-after-trump-shrinks-utah-monuments/. Litigants in that challenge swore that, absent the Monument's protections, they would proceed with new mining claims and the development of existing ones. Decl. of Kyle Kimmerle ¶ 18, *Dalton v. Biden*, consolidated with *Garfield Cnty. v. Biden*, No. 4:22-cv-00059 (Jan. 26, 2023), Dkt. No. 90-7.

92. Experience confirms what will follow. Between February 2, 2018, when the lands excluded by the 2017 Dismantling Proclamation opened to location, and October 8, 2021, when the 2021 Restoration Proclamation restored protections, claimants located

at least twenty new mining claims on those lands, claims the 2016 Designating Proclamation would have prohibited. Kimmerle Mining LLC, for example, located the "Easy Peasy" claim near Cheese and Raisins and Whiskers Draw in October 2018. In February 2019, Kimmerle began uranium and vanadium mining there under a mere notice, using heavy equipment to excavate and remove materials and leaving waste rock, machinery, and other debris behind. Monument status would have barred that notice-level activity altogether, and it would have required a plan of operations and a validity determination before any mining could proceed. Kimmerle also located uranium claims, which it calls "Geitus," near Natural Bridges National Monument, on lands BLM has acknowledged contain Pueblo-era habitation structures. Even after the 2021 Restoration Proclamation, BLM has treated the claims located during that period as valid existing rights.

93. Those claims sit in areas that threaten Plaintiff Nations' cultural and spiritual patrimony and practices, subsistence gathering, and other traditional and contemporary uses. The 2026 Dismantling Proclamation threatens the same harms across roughly 91% of the lands the 2021 Restoration Proclamation protected.

94. Indeed, the harm has already begun. On September 11, 2026, the first day the excised lands opened to location, claimants recorded new mining claims on those lands with the San Juan County Recorder.

95. The claims have multiplied since. By September 28, 2026, it has been reported at least 72 new claims had been located on the excised lands. As of today, on information and belief, 148 claims have been recorded. On each of these claims, under the 2026

Dismantling Proclamation, the claimant may now begin the casual-use and notice-level activities without BLM's prior approval.

96. Mining on the excised lands also threatens contamination that reaches well beyond the claims themselves. Uranium mining exposes radioactive and heavy-metal-bearing rock and leaves ore and waste rock on the surface. From there, wind carries dust, and rain and flash floods carry sediment, into the soils, washes, springs, and seeps that nearby communities and Plaintiff Nations' members depend.

97. The 2026 Dismantling Proclamation's other impacts will soon occur as well. The RMP's remaining protections—including the OHV designations, closures, and use restrictions developed with the Commission—have not yet been amended or withdrawn and remain in force. But the Proclamation directs the Secretaries to displace them, and Agency Defendants have begun implementing the Proclamation.

98. For instance, on the more than one million acres it excises, the 2026 Dismantling Proclamation directs the agencies to maximize motorized access, including on roads and trails never before designated for it. OHV use has long wrought havoc on cultural heritage and archaeological sites across the Bears Ears landscape. Bears Ears Inter-Tribal Coal., *Proposal to President Barack Obama for the Creation of Bears Ears National Monument* 9 (Oct. 15, 2015), Bears-Ears-Inter-Tribal-Coalition-Proposal-10-15-15.pdf ("Bears Ears Proposal").

99. The 2026 Dismantling Proclamation also will lead to vandalism, looting, and grave robbing—historically among the most destructive activities at Bears Ears—by removing monument status, the legal protections, and the enforcement attention that

accompany it. More than a dozen looting cases were reported between May 2014 and April 2015 alone, ranging from "small-scale theft to ancestral remains being tossed around when graves are plundered"; "[t]hese deplorable acts defile the past and wound the present," which for Plaintiff Nations "is so directly connected to the past." Bears Ears Proposal at 35. Removal of monument protections thus subjects countless cultural, archaeological, and paleontological resources of cultural, religious, historical, and scientific importance to Plaintiff Nations to harm through resumed collection, vandalism, looting, and grave robbing.

100. In sum, mining, oil and gas, and other extractive activity purportedly authorized by the 2026 Dismantling Proclamation, together with the OHV use, looting, and collecting the Proclamation invites, will cause:

a. Contamination of nearby communities and their water supplies and soils, leading to health hazards and negative health outcomes;

b. direct damage, disturbance, and destruction of traditional use areas, sacred places, and objects of importance to Plaintiff Nations' ways of life;

c. disturbance of graves, including Native American human remains and funerary objects;

d. destruction or prevention of cultural and spiritual uses by Plaintiff Nations and their members, whether through physical destruction or through visual, auditory, olfactory, and other sensory interference with practices that require tranquil and undisturbed surroundings;

e. loss of access to traditional use areas, sacred places, and objects of

importance to Plaintiff Nations' ways of life, where hazardous conditions make visitation impracticable or dangerous;

f. losses in the quantity and quality of vital water sources in an arid region where clean water is increasingly scarce;

g. the disappearance of the physical markers of Plaintiff Nations' historic relationship with the landscape, diminishing their members' use and enjoyment of it.

**B. Injuries to Plaintiff Nations' Sovereign and Proprietary Interests**

101. These harms will not just impact Bears Ears itself. They will injure Plaintiff Nations' sovereign and proprietary interests.

102. *First*, Defendants have deprived Plaintiff Nations of their role in the management of their own ancestral homelands through the Bears Ears Commission.

103. The Bears Ears Commission is composed solely of elected officers of the Tribal Nations and is an important institutional form of their government-to-government relationship with the United States as to this landscape. As alleged above, the 2026 Dismantling Proclamation declared the Commission "disbanded and terminated," and Agency Defendants have refused to recognize or work with the Commission, cancelled meetings required by the RMP, and refused to follow through with planned monument-management activities. That injury compounds with every decision made about the Monument without the Tribal Nations at the table—decisions Agency Defendants now make without the Tribal Nations' knowledge and expertise, on which the RMP's protection of the Monument's objects depends.

104. This harm also results from the effective revocation of the Monument, independently of the Commission's purported disbandment. The effective revocation of the Monument strips Plaintiff Nations of any secured right in the management of the excised lands. On those lands, that management role now rests only on the RMP that the Proclamation directs them to replace. Even if consultation resumed with the Commission or a comparable tribal entity as to the 2026 monument units, Plaintiff Nations would still have no secured right in the management of the excised lands: not to advance notice of federal undertakings, not to a written explanation when their recommendations are set aside, and not to meetings on at least a quarterly basis to set management priorities. This injury is distinct from the purported termination of the Commission and would persist even if the Commission were reconstituted tomorrow, because Defendants would treat a reconstituted body's proclamation-based role as limited to the 121,096 acres the 2026 Dismantling Proclamation retains.

105. Preventing Plaintiff Nations from stewarding Bears Ears directly harms their sovereign interests. Each Plaintiff Nation's own law makes the protection of its cultural patrimony a responsibility of its government. The Hopi Constitution tasks the Tribal Council with the duty "to protect the arts, crafts, traditions, and ceremonies of the Hopi Indians." Const. of the Hopi Tribe art. VI, § 1(k), Exhibit A. The Ute Mountain Ute Tribal Council has passed three resolutions regarding Bears Ears to fulfill its "responsib[ility] for protecting and promoting the natural, cultural, traditional and archeological resources of the Tribe[.]" *See* UMUT Resolution Exhibit B, March 9, 2016; UMUT Resolution Exhibit C, December 21, 2016 (designating representatives of the

Tribe on the Bears Ears Inter-Tribal Coalition); UMUT Resolution Exhibit D, June 28, 2022 (authorizing and approving the Bears Ears Inter-Tribal Coalition Land Management Plan for Bears Ears). The Zuni Constitution, likewise, charges the Tribe with the protection of Zuni culture. Zuni Tribe Const. art. XVIII, Exhibit E. Defendants' conduct disables each Plaintiff Nation from discharging a duty its own law imposes.

106. Stripping Plaintiff Nations of their stewardship role also causes them financial harm. Defendants' actions have forced Plaintiff Nations to shift leaders, staff, and funds to a separate body created by the Tribal Nations—the Bears Ears Inter-Tribal Coalition—to do the work the Commission was supposed to do.

107. *Second*, Defendants' conduct threatens the environmental integrity of Plaintiff Nations' own lands and the health of their communities. Plaintiff Nations' lands lie in proximity to the excised lands, so contamination from mining and oil and gas development can spread beyond the mining claims themselves onto Tribal lands and into Tribal communities—impacting water supplies, soils, and on-reservation communities alike. These harms cut to the heart of Plaintiff Nations' sovereign interests in the environmental integrity of their lands and the health and wellbeing of their members.

108. The harm to the Ute Mountain Ute Tribe is illustrative. Uranium mining in and around Bears Ears has long had a severe impact on the Ute Mountain Ute and its members. Uranium mined from the excised lands is likely to be refined at the White Mesa Mill in Blanding, Utah—the only fully licensed conventional uranium mill in the United

States—which sits within a few miles of the Tribe's White Mesa community. Trucks carry ore to the Mill on routes passing beside that community; carcinogenic microparticles come loose in transit, are inhaled, and contaminate water and soils, causing elevated rates of lung disease and cancer. The Tribe has fought the Mill's contamination of its homelands for decades. Opening more than one million acres to mining is expected to increase operations at the Mill and to multiply the volume of uranium moving through the Tribe's communities, compounding those harms. Abandoned uranium mines also carry elevated radiation that causes lung and bone cancer and impaired kidney function from radionuclides in drinking water.

109. *Third*, in the case of the Ute Mountain Ute, Defendants' actions will harm property interests. The Ute Mountain Ute and its members hold allotments and grazing permits on lands the 2026 Dismantling Proclamation purported to excise from the Monument. The uses to which the Tribe and its members put those lands are directly impaired by the changed land uses in the Monument.

**C. Injuries to Plaintiff Nations' Members**

110. The 2026 Dismantling Proclamation and Agency Defendants' precipitating illegal conduct also harm Plaintiff Nations' members. Each of Plaintiff Nations has identified tribal members who have traveled to, and intend return to, the excised lands to conduct ceremonies; to hunt, fish, and gather plants, minerals, and water for medicinal and ceremonial use; to care for cultural resources; to pray; to visit ancestors; and to teach younger generations, among other things. The activities the Proclamation has set in motion will damage and destroy the places and objects on which those

practices depend, interfere with and defeat the practices themselves, and expose the members who engage in those practices to contamination and hazardous conditions.

111. Indeed, Plaintiff Nations' members have already experienced harm and will experience further harms from Agency Defendants' handling of the Babylon burn area without the Bears Ears Commission. Agency Defendants imposed emergency response measures in the area via the BAER without consulting and collaborating with the Bears Ears Commission and were thus insufficiently informed to protect and preserve cultural and natural resources upon which Plaintiff Nations' members rely for cultural, spiritual, and subsistence practices.

112. Agency Defendants are poised to perpetuate this harm to a much greater extent over the near 100,000-acre burn area with the Babylon Project, which was, like the BAER, designed without the Commission's participation. The Project's design and plans, such as building new roads and using destructive mechanized methods for tree removal, will interfere with or even defeat Tribal member cultural and spiritual practices by destroying and polluting vegetation, trees, waters, and other materials they use for such things as spiritual offerings and to make regalia for ceremonies. Plaintiff Nations' members will be deprived of wood for ceremonial and subsistence purposes, given the Project's prioritization of using salvaged wood for commercial timber production. Were Agency Defendants fulfilling their legal obligations to consult and collaborate with the Commission, they would have the benefit of the

Commission's Traditional Indigenous Knowledge to craft and carry out a more careful recovery plan.

**FIRST CLAIM FOR RELIEF – MONUMENT REVOCATION**

**Antiquities Act, 54 U.S.C. § 320301 (All Defendants)**

113. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 112.

114. The U.S. Constitution gives Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2.

115. The U.S. Constitution does not vest the President or the Executive Branch with any authority over federal land.

116. The President and the Executive Branch may therefore only exercise authority over federal land to the extent delegated by Congress.

117. Congress delegated limited powers over federal lands to the President in the Antiquities Act. President Trump exceeded his delegated authority in the Antiquities Act when purporting to revoke Bears Ears as a national monument. 54 U.S.C. § 320301.

118. The Antiquities Act empowers the President only to declare national monuments. 54 U.S.C. § 320301(a). It does not delegate power or authorize the President to revoke or undeclare them once designated, either in whole or in part.

119. The Antiquities Act empowers the President only to reserve lands as part of monuments. It does not delegate the power to remove those lands from a monument. *Id.* § 320301(b).

120. In issuing his 2026 Dismantling Proclamation, President Trump acted in contravention of the authority delegated to the President under the Antiquities Act. 54 U.S.C. § 320301. President Trump purported to revoke the lawful establishment of the Monument and to replace it with two different, much smaller monument units, and thereby reduce the public lands reserved as part of the Monument. In doing so, he also purported to remove monument protections for tens of thousands of objects in 1.2 million acres of the Monument, including numerous objects specifically identified in the 2021 Restoration Proclamation.

121. As a result, President Trump's purported revocation of the Monument via the 2026 Dismantling Proclamation is *ultra vires* executive action subject to non-statutory review. The steps Agency Defendants have taken and will take to implement the 2026 Dismantling Proclamation's revocation of the Monument are likewise *ultra vires* executive action subject to non-statutory review.

**SECOND CLAIM FOR RELIEF – MONUMENT REVOCATION**

**U.S. Constitution, Article IV, Section 3, Clause 2, and Article I, Sections 1 and 7 — Separation of Powers (All Defendants)**

122. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 112.

123. The Constitution gives Congress the power over federal lands. U.S. Const. art. IV, § 3, cl. 2. The Constitution likewise gives the lawmaking power to Congress alone. "All legislative Powers herein granted shall be vested in a Congress of the United States,"

U.S. Const. art. I, § 1, and a bill becomes law only after it passes both Houses and is "presented to the President of the United States," *id.* art. I, § 7, cl. 2.

124. The President has no inherent constitutional authority over federal lands. He may reserve federal lands, dispose of them, or make rules for them only to the extent Congress has delegated that power to him by statute.

125. In the Antiquities Act, Congress delegated to the President the power to declare national monuments and to reserve federal lands as part of them. 54 U.S.C. § 320301. Congress did not delegate the power to revoke a national monument, or to shrink the land reserved for it, once the monument is created. That power remains with Congress alone.

126. No statute authorizes the 2026 Dismantling Proclamation. The Proclamation purports to remove more than one million acres from Bears Ears National Monument. It also purports to open those lands to uses forbidden by the Monument's reservation, including location and entry under the mining laws. In issuing it, the President usurped Congress's power under the Property Clause to dispose of federal property and to make the rules that govern it. He thereby acted beyond constitutional authority and violated the separation of powers.

127. Because the 2026 Dismantling Proclamation rests on no lawful authority, the Agency Defendants have no authority to implement it. Their actions to carry out the purported revocation of the Monument, including treating the excised lands as open to location and entry under the mining laws, are thus likewise beyond constitutional authority and violate the separation of powers.

**THIRD CLAIM FOR RELIEF – MONUMENT REVOCATION**

**Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (All Agency Defendants)**

128. Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 112.

129. The APA provides a cause of action to any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, and makes final agency action reviewable, *id.* § 704. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." *Id.* § 706(2)(A), (C).

130. President Trump had no lawful authority to revoke the Monument or shrink its boundaries. The 2021 Restoration Proclamation therefore remains in effect, and Agency Defendants remain bound by it across the full, 1.36-million-acre Monument.

131. Since President Trump issued the 2026 Dismantling Proclamation, Agency Defendants have made a final decision to implement its purported revocation of the Monument, rather than the 2021 Restoration Proclamation, going forward. That decision marks the consummation of Agency Defendants' decision making and is a decision from which legal consequences flow.

132. Upon information and belief, Agency Defendants have carried out that decision, and are violating and will continue to violate the 2021 Restoration Proclamation, by:

a. removing signs and public markers that delineate the Monument boundaries set by the 2021 Restoration Proclamation, thereby inviting development and mining claims on the lands the 2026 Dismantling

Proclamation excluded;

b. managing the excluded lands as available for mineral exploration and development under the General Mining Act of 1872;

c. recording new hard rock mining claims located in the excluded lands, which the 2021 Restoration Proclamation prohibits, treating those claims as valid, and allowing mining activity on them to move forward;

d. allowing development on existing mining claims to move forward without the restrictions and protections required for claims on national monument lands;

e. developing and implementing a monument management plan that incorporates the 2026 Dismantling Proclamation's purported revocation of the Monument's boundaries; and

f. failing to recognize and work with the Bears Ears Commission or a comparable entity.

133. Agency Defendants' actions implementing the President's purported revocation of the Monument are arbitrary, capricious, not in accordance with law, and in excess of their authority. They carry out a proclamation the President had no authority to issue, and they violate the 2021 Restoration Proclamation, which remains in effect.

**FOURTH CLAIM FOR RELIEF – COMMISSION TERMINATION**

**Antiquities Act, 54 U.S.C. § 320301 (All Defendants)**

134. Plaintiffs re-allege and incorporate by reference all the allegations set forth in paragraphs 1 through 112.

135. The Antiquities Act is a grant of power to protect, not to withdraw protection. It authorizes the President to "declare by public proclamation" national monuments and to "reserve parcels of land as a part of the national monuments," 54 U.S.C. § 320301(a)–(b), and it speaks only of the "proper care and management of the objects to be protected," *id.* § 320301(b). Nothing in the Act authorizes the President to revoke or diminish protections once conferred, least of all by abolishing a body whose very purpose is to ensure, through the participation of sovereign tribal nations, that a monument's objects receive the proper care and management the Act demands.

136. The 2026 Dismantling Proclamation nonetheless declares that "[t]he BEC is hereby disbanded and terminated, and the Secretaries shall have no obligation to engage, consult, or coordinate with the BEC or a comparable entity as provided in, or derived from, either Proclamation 9558 or 10285."

137. Moreover, even if the President's authority to provide for the proper care and management of monument objects permitted him to disestablish the Commission in some circumstances, it does not support the termination here. The President does not find in the 2026 Dismantling Proclamation that terminating the Commission serves the proper care and management of any object.

138. As a result, President Trump's purported termination of the Commission via the 2026

Dismantling Proclamation is *ultra vires* executive action subject to non-statutory review. The steps Agency Defendants have taken and will take to implement the Commission's purported termination are likewise *ultra vires* executive action subject to non-statutory review.

**FIFTH CLAIM FOR RELIEF – COMMISSION TERMINATION**

**Administrative Procedure Act, 5 U.S.C. §§ 701-706 (All Agency Defendants)**

139. Plaintiffs re-allege and incorporate by reference all the allegations set forth in paragraphs 1 through 112.

140. After the 2026 Dismantling Proclamation issued, Agency Defendants decided to cease implementing the Tribal Co-Stewardship provisions of the RMP. That decision is reflected in the agencies' July 15, 2026 statement that they would no longer recognize the Commission or engage with it in implementing the RMP, that they would work with tribal representatives only through the Proclamation's federal advisory committee or NHPA section 106 consultation, and that they regarded the provisions of the RMP implicating the Commission as "overridden" by the Proclamation. It is also reflected in the agencies' refusal on July 16, 2026 to engage with the Commission's members on the wildfire monitoring and special recreation permit review planned for that day; in Jared Lundell's August 7, 2026 cancellation, "due to the changes in the proclamation," of the standing meeting invitation used to fulfill the RMP's regular meeting requirements; in the agencies' refusal to work with the Commission on the pending special recreation permit for an ATV rally; in the Forest Service BAER team's initial assessment of the Babylon Fire burned area, and its development of emergency

treatments for cultural sites there, without notice to or collaboration with the Commission; and in the Forest Service's work on the Babylon Project without any of the notice or collaboration that the RMP requires.

141. Since July 13, 2026, Agency Defendants have not notified the Commission or any comparable tribal representative body before initiating any implementation-level project, including the Babylon Project. Nor have they held the regular meetings the RMP requires, including the two-day quarterly meeting scheduled for the end of October 2026. Nor have they convened the annual review of the RMP or developed a joint annual work plan. The RMP requires each of these.

142. Agency Defendants' decision is final agency action. 5 U.S.C. § 704. It marks the consummation of their decision making: Agency Defendants communicated it to Plaintiff Nations both orally and in writing as a definitive position, and they have acted on it in every decision since. And it determines rights and obligations: it withdraws from Plaintiff Nations procedures the RMP guarantees them.

143. That final agency action violates the RMP and thus is unlawful. The RMP remains in effect. A land use plan may be amended only through prescribed procedures, including public notice and an opportunity for public participation. 43 C.F.R. §§ 1610.2, 1610.5-5; 16 U.S.C. § 1604(f)(4); 36 C.F.R. §§ 219.13, 219.16. Neither agency has amended the RMP, so they remain binding on the agencies.

144. The 2026 Dismantling Proclamation does not excuse Agency Defendants' decision. The President's purported termination of the Commission in the Proclamation is *ultra vire*s

and void, as alleged in the Fourth Claim for Relief. Nor can a proclamation, even if otherwise valid, amend a land use plan.

145. Agency Defendants' decision is also arbitrary and capricious. Agency Defendants did not consider whether the Proclamation could, or did, relieve them of obligations arising under the RMP. They did not consider Plaintiff Nations' substantial reliance interests. And they did not consider alternatives short of wholesale abandonment, such as continuing to afford the RMP's procedures to a comparable tribal representative body.

**SIXTH CLAIM FOR RELIEF – BABYLON DECISION**

**Administrative Procedure Act, 5 U.S.C. §§ 701-706 (Forest Service Defendants)**

146. Plaintiffs re-allege and incorporate by reference all the allegations set forth in paragraphs 1 through 112.

147. The APA directs a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

148. Forest Service Defendants are required to comply with the notice-and-collaboration procedures of the RMP, including those in Forest Service ROD Attachment 3. Those notice-and-collaboration procedures are phrased in mandatory terms. They impose specific, numerical deadlines triggered by the agencies' own decision to initiate a project. They may be modified only by agreement. And the RMP itself describes these deadlines as "imposed by . . . this plan." Forest Service ROD Attachment 3 at 3.

149. For each implementation-level project, those procedures require Forest Service Defendants to take specific actions at specific times. They must:

A. notify the Commission at least fifteen business days before initiating the project;

B. provide a schedule for the Commission's input;

C. notify the Commission before each internal review stage;

D. notify the Commission before any decision issues;

E. explain in writing any decision not to adopt the Commission's written recommendations; and

F. afford the opportunity to elevate disagreement to the regional forester.

150. The Babylon Project is an implementation-level project subject to these procedures. Yet Forest Service Defendants have taken none of the required actions. They initiated the Babylon Project without notice to the Commission. They have provided no schedule for the Commission's input and no notice before any internal review stage. They have not collaborated with the Commission, or with any comparable Tribal representative body, on the site-specific implementation-level management the Babylon Project entails. Instead, they are developing the Babylon Project in accordance with Agency Defendants' decision to cease implementing the Tribal Co-Stewardship provisions of the RMP.

151. Each of these is a discrete action that Forest Service Defendants are required to take. The RMP leaves them no discretion over whether to provide notice, to whom, or when. The passing of the deadline for the initial notice does not extinguish the obligation to give it, and the remaining obligations must be performed before any decision issues.

152. Forest Service Defendants' failure to act continues to deprive Plaintiff Nations of the staged input, the written explanation of any rejected recommendation, and the right to elevate disagreement to the regional forester that the RMP guarantees, on a project that would authorize ground disturbance across tens of thousands of acres of their ancestral homeland.

153. Forest Service Defendants' failure to provide the notice and collaboration the RMP requires constitutes agency action unlawfully withheld or, in the alternative, unreasonably delayed. 5 U.S.C. § 706(1). The Court should compel Forest Service Defendants to take each of the required actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Nations respectfully request that the Court:

1. Declare that the 2026 Dismantling Proclamation exceeds the President's authority under the Antiquities Act, 54 U.S.C. § 320301, is *ultra vires*, and is void ab initio;
2. Declare that the 2026 Dismantling Proclamation violates the Property Clause, U.S. Const. art. IV, § 3, cl. 2, and the separation of powers, U.S. Const. art. I, §§ 1, 7, and is void ab initio;
3. Declare that the 2021 Restoration Proclamation remains in effect and controls the objects comprising, the lands reserved as part of, and the management of Bears Ears National Monument;
4. Declare unlawful, and vacate and set aside, Agency Defendants' decision to implement the 2026 Dismantling Proclamation's purported revocation of the Monument;

5. Enjoin Agency Defendants from implementing the 2026 Dismantling Proclamation's purported revocation of the Monument, including through any management plan, transportation plan, or other plan premised on it, and from recording, processing, or treating as valid any mining claim located on, or approving any notice or plan of operations for, lands reserved by the 2021 Restoration Proclamation;
6. Declare that any mining claims, mineral leases, or other permits or authorizations premised on the validity of the 2026 Dismantling Proclamation are void ab initio;
7. Declare that the provision of the 2026 Dismantling Proclamation purporting to terminate the Commission, and to relieve the Secretaries of any obligation to engage, consult, or coordinate with the Commission or a comparable entity, is *ultra vires* and void, and enjoin Agency Defendants from giving that provision effect;
8. Declare unlawful, and vacate and set aside, Agency Defendants' decision to cease implementing the Tribal Co-Stewardship provisions of the RMP;
9. Declare that, unless and until the RMP is lawfully amended, it remains in effect and govern all lands within its decision areas, including lands purportedly excluded from the Monument by the 2026 Dismantling Proclamation;
10. Enjoin Agency Defendants, unless and until the RMP is lawfully amended, from initiating or approving any implementation-level project within the RMP's decision areas (or, in the alternative, within the boundaries of the Monument as modified by the 2026 Dismantling Proclamation) without first providing the notice and opportunity to collaborate required by the RMP, including by BLM ROD §§

2.3.1.1 and 2.3.1.2 and Forest Service ROD Attachment 3;

11. Enjoin Forest Service Defendants from implementing the Babylon Decision, including salvage harvest, temporary road construction, road reconstruction, trail relocation, and other ground-disturbing activities under the Babylon Decision within the BENM designated area unless and until they comply with the RMP;

12. Award Plaintiff Nations their fees and costs under 28 U.S.C. § 2412 or other applicable authority; and

13. Grant such other and further relief as the Court deems just and proper.

Dated: November 18, 2026

Respectfully submitted,

/s/ *Matthew Campbell*

Matthew Campbell
D.C. Bar CO0060
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
303-447-8760

Leonard R. Powell
D.C. Bar 1048832
powell@narf.org
NATIVE AMERICAN RIGHTS FUND
950 F Street, NW, Suite 1050,
Washington, DC 20004
202-785-4166

*Attorneys for Plaintiffs Hopi Tribe, Ute Mountain Ute Tribe, and Zuni Tribe*

David C. Mielke
D.C. Bar No. 412580
dmielke@abqsonosky.com

SONOSKY, CHAMBERS, SACHSE,

MILLER, MIELKE & BROWNELL LLP
500 Marquette Avenue, NW
Suite 660
Albuquerque, NM 87102
(505) 247-0147

Whitney A. Leonard
*Pro hac vice application forthcoming*
whitney@sonosky.net

K. Amanda Saunders
*Pro hac vice application forthcoming*
amandas@sonosky.net

SONOSKY, CHAMBERS, SACHSE, MILLER & MONKMAN LLP
510 L St.
Suite 310
Anchorage, AK 99501
(907) 258-6377

*Attorneys for the Zuni Tribe*